junction post security, in an amount set by the court.

Ladner correctly traces the origin of the "no bond, no damages" rule. The rule was originally enunciated in *Russell v. Farley*, 105 U.S. (15 Otto) 433, 26 L.Ed. 1060 (1881), and followed in *Meyers v. Block*, 120 U.S. 206, 7 S.Ct. 525, 30 L.Ed. 642 (1887), both predating the Judicial Code of 1914. However, the fact that the Supreme Court precedent we relied on predated the 1914 Code does not call into question the validity of *Jewell* as governing authority in this case. The Supreme Court has, since the enactment of the Judicial Code, reaffirmed the "no bond, no damages" rule. *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2185 n. 14, 76 L.Ed.2d 298 (1983) (citing *Russell v. Farley*, 105 U.S. (15 Otto) 433, 26 L.Ed. 1060 (1881), and *Buddy Systems, Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164, 1167–68 (9th Cir.1976), *cert. denied*, 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977)); *Lawrence v. St. Louis-San Francisco R. Co.*, 278 U.S. 228, 233, 49 S.Ct. 106, 107, 73 L.Ed. 282 (1929).[3] Therefore, we agree with the district court's conclusion that *Jewell* requires the dismissal of Ladner's counter-claim for damages since no bond was posted by First Mississippi.[4]

### III.

Because we find that the district court correctly denied Ladner's counter-claim for damages, the district court's judgment is AFFIRMED.

3. Other federal courts have recognized the "no bond, no damages" rule. *See e.g., Buddy Systems, Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164, 1167–68 (9th Cir.1976), *cert. denied*, 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977); *United Motors Services v. Tropic-Aire*, 57 F.2d 479, 483 (8th Cir.1932), *Northern Oil Co. v. Socony Mobile Oil Co.*, 347 F.2d 81, 83 (2d Cir.1965); *but see Monroe Division, Litton Business Systems, Inc. v. De Bari*, 562 F.2d 30 (10th Cir. 1977).

4. Ladner argues that damages are appropriate here because we awarded damages in *Grant v. Smith*, 574 F.2d 252, 256 (5th Cir.1978), two months after we decided *Jewell*. Ladner asserts that no bond was posted in *Smith*. However, we must disagree with Ladner that *Smith* com-

**Victoria A. SMITH, on behalf of herself and all others similarly situated, Plaintiff-Appellant,**

v.

**TEXAS DEPARTMENT OF WATER RESOURCES, et al., Defendants-Appellees.**

No. 85–1453.

United States Court of Appeals, Fifth Circuit.

Sept. 15, 1986.

Stephen Greenberg, Martin, Cox & Greenberg, Sheila S. Asher, Austin, Tex., for plaintiff-appellant.

Carla M. Crisford, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for defendants-appellees.

Before REAVLEY and POLITZ, Circuit Judges, and KAZEN *, District Judge.

* District Judge of the Southern District of Texas, sitting by designation.

KAZEN, District Judge:

Victoria A. Smith brought suit against her former employer, the Texas Department of Water Resources ("TDWR") and its Executive Director, Charles E. Nemir, in his official capacity, alleging that her discharge from employment was a result of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*[1] After trial to the court, judgment was rendered for the Defendants based on written findings of fact and conclusions of law. Because the findings lack the required specificity to permit effective appellate review, we vacate the judgment and remand for further proceedings.

## I. *Background.*

Smith's evidence reflected that at the time of her discharge in January, 1983, she was employed by TDWR as an Engineering Aide III in the Topographic Mapping department (Topo'Mapping) of the Data and Engineering Services Division. She had first been employed as a secretary at TDWR in September 1982, but applied for the engineering aide's position when a vacancy was posted in October 1982. She applied even though the aide's position would initially pay less than her secretarial position. Smith wanted to transfer because of her technical background, including a Bachelor of Science degree in photography, and her perception that a technical career offered more long-term opportunity for advancement than did a secretarial position. While interviewing for the new position, she sought and obtained assurance from TDWR's interviewer that the position was indeed a technical one, not involving secretarial duties. This assurance also conformed to the written job description furnished by TDWR. Smith was selected for the aide's position effective November 22, 1982.

On January 13, 1983, Smith was asked to report to Charles R. Baskin, the then-Director of the Division, at his office on another floor. Baskin requested of Smith "a favor," namely that she relieve Baskin's secretary on a daily basis. This relief duty was to be permanent, consisting of 30 minutes each morning and afternoon. Smith was skeptical of the latter aspect, because on one previous occasion she had agreed to relieve Baskin's secretary for 20 minutes but was kept for 3 hours. She also felt that she was being channeled back into the secretarial field from which she had so recently taken affirmative steps to leave. Moreover, the aide's position, unlike that of a secretary, was one in which the employee's production was measured. To the extent that Smith would be performing secretarial duties outside her department, she felt her measurable production in the aide's job and therefore her job evaluations would be adversely impacted.

Smith did not initially refuse Baskin's request but asked for time to think about it. She then received from Baskin a memo dated January 17, 1983, stating that the prior request for Smith to perform secretarial duties was now an assignment effective January 20, 1983, and that refusal to accept this assignment would constitute grounds for immediate termination. On January 20, Baskin called Smith to ask if she were going to relieve his secretary that day. When she replied that she needed more time to think about it, Baskin hung up. Smith attempted to telephone Baskin that afternoon, without success, and he did not return her call. Smith was next contacted on January 31, 1983, when she was handed her termination notice. No one was hired to replace Smith as an engineering aid, and Baskin's secretary was thereafter relieved by other secretaries.

Emil Blomquist, Smith's immediate supervisor in Topo'Mapping, testified that the only other employee from that department ever requested to do secretarial relief work was Amy Nevarez, who was also the only other female employed in Topo'Mapping prior to Ms. Smith. None of the prior male employees in Topo'Mapping was ever asked to perform secretarial relief work. Blom-

---

1. Smith also originally sued Charles R. Baskin, the protagonist in this case, but voluntarily dismissed him prior to trial. Baskin did not testify at the trial, either in person or by deposition.

quist also testified that it was unusual procedure for Baskin to make a direct work assignment to someone in Blomquist's section, and that he regarded Smith's secretarial assignment as unreasonable. Blomquist considered Smith to be a good, dependable employee and was not consulted about the decision to fire her. Blomquist also described as insubordinate a male employee who preceded Ms. Smith and Amy Nevarez; Baskin took no disciplinary measures against this male employee and in fact he was later given a merit raise.

Bobbie Critendon was Blomquist's supervisor and Smith's "second-line supervisor." He likewise did not participate in the decision to fire Smith and was unaware of any other incident in the TDWR where neither the first-line nor second-line supervisor participated in a decision to discipline an employee. In a written evaluation of December 1982, Critendon stated that Ms. Smith was "becoming an outstanding employee" and at trial stated she was virtually a "model employee." Critendon likewise could not recall any male employee from Topo'Mapping ever being requested to perform secretarial duties.

Gary L. Otting, TDWR's Director of Personnel, acknowledged that secretarial work was not related to the job description for an Engineering Aide and stated that no person in the agency had authority to unilaterally rewrite a job description. Baskin had approved and signed the Engineering Aide's job description before it was posted and had the opportunity to give input about its contents. The description makes no reference to secretarial duties, although it does provide that the aide may "[a]ssist in other Division programs as needed."

Finally, Amy Nevarez testified that while employed as an Engineering Aide, she had been requested to do secretarial relief work for Baskin although she could not type and had no secretarial skills.

Defendants called no witnesses, but developed their case through cross-examination of Plaintiff's witnesses. Their evidence indicated that at least one other male employee, albeit not from Topo'Mapping, "routinely" relieved secretaries although it was not part of his job description; that the predecessor male employee mentioned by Blomquist had never been insubordinate; that performing part-time secretarial duties would not adversely impact Smith's future performance evaluations; and that Baskin did have authority to change an employee's job description. Defendants also elicited testimony suggesting that budgetary pressures and staff reductions required the agency to be "flexible" and demanded that the Director modify individual assignments to meet the needs of the agency. It was further established that, because she had been employed at TDWR less than six months, Smith was considered to be on "probationary status."

This evidence obviously could lead to sharply conflicting conclusions. Plaintiff described a model female employee, having recently transferred from a secretarial to a technical position at personal cost, unnecessarily re-assigned to secretarial duties contrary to her job description and agency procedures, which duties were never required of male employees, and summarily fired for balking at the assignment. Defendants saw an insubordinate probationary employee who refused to perform a direct job assignment, placing her personal preferences above the needs of the employer. Deciding between these two versions would require resolution of several key fact questions, including: were male employees in technical positions ever required to perform secretarial duties on a regular basis? Did legitimate budgetary or personnel problems prompt Smith's secretarial assignment? Did Baskin violate agency policies in deciding to assign Smith or to subsequently fire her? Was a male predecessor to Ms. Smith undisciplined for similar conduct? Would the part-time secretarial work adversely affect Smith's job evaluations, a disadvantage not imposed upon male employees? Unfortunately none of these questions were answered by the trial court.

## II. *Trial Court's Findings and Conclusions.*

The Court made seven findings of fact, four of which pertained to uncontested jur-

isdictional and background facts. The only three findings arguably addressing the contested issues were:

4. During the period of her employment as an Engineering Aide III, Plaintiff performed her job in a satisfactory manner and did not violate the conditions of probation, other than refusing to provide secretarial relief as requested.

5. On January 13, 1983, Plaintiff was orally requested to perform secretarial work for approximately ½ hour per morning and ½ hour per afternoon. On January 17, 1983, Plaintiff received the same request in the form of a written work assignment, advising her that if she refused the assignment, her refusal would be grounds for termination.

6. Plaintiff was terminated from her position as Engineering Aide III, for failure to report for part-time secretarial duties. At this time, she was still a probationary employee.

The Court made nine conclusions of law. Four did not relate to any contested issue. In the remaining five conclusions, the trial court first held that the Plaintiff had failed to establish a prima facie case of discriminatory discharge because "she has failed to establish that she was discharged for a non-valid, discriminatory reason. The Defendant has not sought applicants for the position vacated by Plaintiff." The Court then added:

4. Assuming, *arguendo*, that Plaintiff did establish her prima facie case, Defendant has articulated a valid business reason for discharging Plaintiff, namely, that she refused and failed to perform part-time secretarial relief work as was requested.

5. Plaintiff has failed to prove Defendant's reason for her discharge was pretextual. The Defendant had the right to terminate probationary employees at will.

6. Defendant's decision to terminate Plaintiff was not motivated by her sex. The Court finds any evidence to the contrary not to be credible.

7. There is no credible evidence of disparate treatment of Plaintiff based upon her sex.

## III. *Discussion.*

It is evident that the trial court's fact findings simply recite bare historical events that were essentially undisputed, *viz* that Plaintiff was hired as an engineering aide, generally performed satisfactorily, was then requested to perform secretarial relief work, and was terminated for failing to do so. The findings do not even address the real issue of whether Plaintiff's continued employment was conditioned upon a "women only" assignment, to the detriment of her technical position. The conclusions of law, alternatively adopted as fact findings, add little more.

■■■ The conclusion that Plaintiff failed to establish "a prima facie case" appears to be based on the finding that TDWR did not seek applicants for the position vacated by Plaintiff. While this may be an element in the normal discharge case, *Jackson v. City of Killeen*, 654 F.2d 1181, 1183 (5th Cir.1981), the facts necessarily vary in Title VII cases and the normal requirements of a prima facie case are "not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817–24 n. 13, 36 L.Ed.2d 668 n. 13 (1973). Here the essence of Plaintiff's complaint was not that the employer chose to substitute a male for a female engineering aide; instead it was that male engineering aides were historically allowed to perform their legitimate duties while female aides were required to also serve as part-time secretaries. From that perspective, Plaintiff clearly established a prima facie case. More importantly, at the conclusion of Plaintiff's case, Defendants' motion for dismissal was denied. Defendants thereupon rested, presumably satisfied they had made their case on cross-examination of Plaintiff's witnesses. Nevertheless they were afforded the opportunity to offer evidence. When the Defendant "fails to persuade the district court to dismiss the ac-

tion for lack of a prima facie case" and the case is thus "fully tried on the merits," the true issue becomes whether the plaintiff has proved the ultimate question of discrimination; whether plaintiff properly made a prima facie case "is no longer relevant." *U.S. Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).

The statement in the trial court's Conclusion No. 5 that TDWR had the right to terminate probationary employees at will is also problematical. If it is intended as a justification for the companion statement that Plaintiff failed to prove pretext, it is incorrect. The concept of a probationary employee, often critical in a due process discharge case, has little relevance in a Title VII case. The complex statutory scheme prohibiting employment decisions based on an individual's race, color, religion, sex or national origin cannot be avoided by classifying employees as "probationary."

What remains of the trial court's findings and conclusions is simply the statement that Plaintiff's failure to perform part-time secretarial relief work was "a valid business reason" for her discharge, and that any contrary evidence of sex discrimination is not credible. This is inadequate.

Federal Rule of Civil Procedure 52(a) requires the trial court to "find the facts specially." The findings must be explicit enough to allow for appellate review:

> "If the trial court believes the employer's explanation of its motivation, the courts may not merely state, in conclusory terms, that the plaintiff has failed to prove the employer's suggested reason to be a pretext for invidious discrimination or that there is no evidence of discriminatory treatment. It must at least refer to the evidence tending to prove and disprove the merits of the proffered explanation and state why the court reached the conclusion that the explanation has not been discredited."

*Ratliff v. Governor's Highway Safety Program,* 791 F.2d 394, 400 (5th Cir.1986).

As stated in *Redditt v. Mississippi Extended Care Centers, Inc.,* 718 F.2d 1381, 1386 (5th Cir.1983):

> "In reviewing the district court's finding of no discrimination under the clearly erroneous standard, this Court cannot be left to second guess the factual basis for the district court's conclusion. This Court cannot determine whether the district court's finding that plaintiff failed to demonstrate pretext was clearly erroneous when the district court's finding is not expressed with sufficient particularity. It is not the function of this Court to make credibility choices and findings of fact."

We must therefore remand this case to district court for further findings. After reviewing the evidence, the district court is obviously "free to change, modify, or reassert" its conclusion on the ultimate question of discrimination *vel non. Id.* at 1386.

The judgment is VACATED, and the cause REMANDED for the limited purpose of making further findings. The supplemental record will then be referred to this panel which retains jurisdiction except for the limited remand.